**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)
Joshua D. Bendor (AZ Bar No. 031908)
Clinten N. Garrett (AZ Bar No. 022457)
Syreeta A. Tyrell (AZ Bar No. 034273)
Alexa G. Salas (AZ Bar No. 039722)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Joshua.Bendor@azag.gov
Clinten.Garrett@azag.gov
Syreeta.Tyrell@azag.gov
Alexa.Salas@azag.gov
ACL@azag.gov
*Attorneys for Plaintiff State of Arizona*

*Additional Counsel Listed on Signature Page*

**ROB BONTA**
**Attorney General of California**
Neli Palma
Senior Assistant Attorney General
Kathleen Boergers (CA Bar No. 213530)
Nimrod Pitsker Elias (CA Bar No. 251634)
Supervising Deputy Attorneys General
Katherine Milton (CA Bar No. 284803)
Marnie G. Ganotis (CA Bar No. 206178)
Deputy Attorneys General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7020
(415) 510-4400
Kathleen.Boergers@doj.ca.gov
Nimrod.Elias@doj.ca.gov
Katherine.Milton@doj.ca.gov
Marnie.Ganotis@doj.ca.gov
*Attorneys for Plaintiff State of California*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF ARIZONA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT F. KENNEDY, JR., *et al.*, <br><br> Defendants. | Case No. 3:26-cv-01609-VC <br><br> **Plaintiffs' Opposition to Motion to Dismiss** <br><br> Hearing Date: August 13, 2026 <br> Time: 10:00 a.m. <br> Judge: Hon. Vince Chhabria <br> Place: San Francisco Courthouse <br> Courtroom 3, 17th Floor |

**Table of Contents**

**Table of Authorities** ...................................................................................................... III

**Introduction** ............................................................................................................... 1

**Background** ................................................................................................................ 1

    I.    Factual background. ....................................................................................... 1

        A.    The CDC, ACIP, and Plaintiff States have critical statutory public-health roles. ...... 1

        B.    Secretary Kennedy unilaterally reconstitutes ACIP. ..................................................... 2

        C.    The Kennedy-dominated ACIP weakens the childhood vaccination schedule. .......... 3

        D.    Kennedy bypasses ACIP entirely to implement the Kennedy Schedule. .................... 4

    II.    Procedural background. .................................................................................. 5

**Argument** ................................................................................................................... 5

    I.    Plaintiffs allege concrete, cognizable injuries. ................................................. 6

    II.    Defendants' various attacks on standing are unavailing. .................................. 10

**Conclusion** ............................................................................................................... 15

                               

**Table of Authorities**

**Page(s)**

**Cases**

*Am. Acad. of Pediatrics v. Kennedy*,
823 F. Supp. 3d 141 (D. Mass. 2026) ................................................................................. 13

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........................................................................................................... 5, 8

*California v. Azar*,
911 F.3d 558 (9th Cir. 2018) ........................................................................................ 11, 14

*City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*,
981 F.3d 742 (9th Cir. 2020) ................................................................................................. 6

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................................................... 8, 12

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .............................................................................................................. 12

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .............................................................................................................. 15

*FDA v. All. of Hippocratic Med.*,
602 U.S. 367 (2024) ......................................................................................................... 10, 12

*Massachusetts v. US Dep't of Health & Hum. Servs.*,
923 F3.d 209 (1st Cir. 2019) ................................................................................................... 6

*Nat. Res. Def. Council v. McCarthy*,
231 F. Supp. 3d 491 (N.D. Cal. 2017) .................................................................................... 6

*New York v. Kennedy*,
155 F.4th 67 (1st Cir. 2025) ......................................................................................... 6, 7, 12

*Oregon v. Kennedy*,
No. 6:25-CV-02409-MTK, 2026 WL 1048354 (D. Or. Apr. 18, 2026) ................................ 15

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) .............................................................................................................. 14

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ................................................................................................. 6

Pltfs.' Opp. to Mot. to Dismiss

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ............................................................................... 9

*United States v.Texas,*
    599 U.S. 670 (2023).......................................................................................... 12

*Washington v. FDA,*
    108 F.4th 1163 (9th Cir. 2024) ......................................................................... 11

*Washington v. Trump,*
    145 F.4th 1013 (9th Cir. 2025) ..................................................................... 9, 15

**Statutes**

5 U.S.C. § 704................................................................................................... 13

5 U.S.C. § 1004................................................................................................... 2

42 U.S.C. § 243(a) ........................................................................................ 1, 15

42 U.S.C. § 300gg-13(a)(2) ............................................................................... 2

42 U.S.C. § 1396a(a)(10)(A) ............................................................................. 2

42 U.S.C. § 1396d............................................................................................... 2

42 U.S.C. § 1396s(e)........................................................................................... 2

42 U.S.C. § 1397bb(a)(7)(A) ............................................................................. 2

A.R.S. § 36-132(A)........................................................................................... 12

Cal. Health & Safety Code § 131056(d)........................................................... 12

**Regulations**

41 C.F.R. § 102-3.60(b)...................................................................................... 2

41 C.F.R. § 102-3.105(g).................................................................................... 2

42 C.F.R. § 457.520............................................................................................ 2

Case No. 3:26-cv-01609-VC                              Pltfs.' Opp. to Mot. to Dismiss

**Introduction**

Between June 2025 and January 2026, Secretary Robert F. Kennedy, Jr. and the other Defendants discarded decades of critical science-based immunization policy by gutting the Advisory Committee on Immunization Practices ("ACIP") and then unilaterally promulgating an arbitrarily weakened childhood immunization schedule. This was a public-health earthquake that imposed financial and resource costs on Plaintiff States, and will continue to do so as it predictably causes vaccination rates to fall and disease rates to rise. Defendants cannot evade judicial review of their failure to follow lawful and rational administrative processes to make consequential decisions, particularly when Plaintiff States have historically relied on these processes to promote and protect public health. Defendants' idiosyncratic preferences are no substitute for an established, scientifically sound process, and Defendants cannot negate well-pled injury allegations by disclaiming responsibility for the harm their actions cause.

The Court should deny the Motion.

**Background**

I.  **Factual background.**

A.  **The CDC, ACIP, and Plaintiff States have critical statutory public-health roles.**

Under federal law, the Secretary of the Department of Health and Human Services ("HHS") must assist states "in the prevention and suppression of communicable diseases" and advise states "on matters relating to the preservation and improvement of the public health." 42 U.S.C. § 243(a); Compl. ¶ 54. To aid the Centers for Disease Control and Prevention's ("CDC") statutory functions, ACIP advises the CDC Director on the "use of vaccines and related agents for effective control of vaccine-preventable diseases in the civilian population of the United States." *Charter of the Advisory Committee on Immunization Practices* ("Charter"), at 1 (Apr. 1, 2024, as amended Dec. 3, 2025); Compl. ¶ 55. As a federal advisory committee, ACIP is subject to the Federal Advisory

1

Committee Act's ("FACA") requirements, including that its membership be "fairly balanced in terms of the points of view represented and the functions to be performed," and that its recommendations reflect "independent judgment," and not be "inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. § 1004(b)(2)-(3), (c); *see also* 41 C.F.R. § 102-3.60(b) (considerations for establishing balanced membership); 41 C.F.R. § 102-3.105(g) (responsibilities of the agency head to ensure "independent judgment" from ACIP).

As a measure of ACIP's centrality in public health, its recommendations are incorporated throughout federal and state law. Among other essential functions, ACIP reviews and revises the schedule for pediatric vaccines covered by the Vaccines for Children ("VFC") Program, which provides free, ACIP-recommended vaccines to eligible children. *See* 42 U.S.C. § 1396s(e). ACIP's recommendations set the floor for which vaccines must be covered under State Plans for Medicaid and the Children's Health Insurance Program. 42 U.S.C. § 1396a(a)(10)(A); 42 U.S.C. § 1396d(a)(13)(B), (a)(4)(B), (r)(1)(B)(iii); 42 U.S.C. § 1397bb(a)(7)(A); 42 C.F.R. § 457.520. And the Affordable Care Act also requires insurers to cover, without cost-sharing, all vaccines recommended by ACIP. 42 U.S.C. § 300gg-13(a)(2).

As discussed further below, ACIP's recommendations are also incorporated throughout state public health systems, including in school admission and immunization tracking requirements.

**B. Secretary Kennedy unilaterally reconstitutes ACIP.**

On February 13, 2025, Congress confirmed Kennedy as HHS Secretary. During his nomination process, Secretary Kennedy promised Congress that he would leave ACIP undisturbed. Compl. ¶ 5. Nonetheless, shortly thereafter, he abruptly dismissed all seventeen ACIP voting members via an opinion column in the *Wall Street Journal* and a post on X. *Id.* ¶ 66.

Consistent with ACIP's rigorous scientific mandate, its policies provide for selection of

members following Federal Register notice, broadly solicited applications or nominations, consultation with ACIP's Steering Committee, and a complete vetting process. Compl. ¶ 67; Ctrs. for Disease Control and Prevention, *Advisory Committee on Immunization Practices Policies and Procedures*, at 16-20 (Jun. 2022); Ctrs. for Disease Control and Prevention, Membership Balance Plan, at 3 (Jan. 29, 2024); *see also, e.g.,* Compl. ¶ 71 (ACIP Steering Committee considers potential nominees' qualifications). This process ensured that "ACIP voting members had prolific experience studying and/or administering vaccines and … had contributed to the understanding of vaccines and their administration through original research reports in peer-reviewed medical, scientific, and public health journals." Compl. ¶ 73.

But Secretary Kennedy did not follow this process.  Instead, he repopulated ACIP "with unqualified individuals whose minority anti-vaccine views align with Kennedy's views, and over whom Defendants can exert inappropriate influence." Compl. ¶ 76; ¶¶ 77, 80 (at least nine of the thirteen appointments "lack the experience and/or professional qualifications required by ACIP's Charter" and have publicly disclosed anti-vaccination views); ¶ 79 (six appointees have no documented vaccine research experience and three have minimal experience); ¶ 82 (Kennedy-aligned anti-vaccine activist screened candidates based on childhood vaccine views).

### C.  The Kennedy-dominated ACIP weakens the childhood vaccination schedule.

Historically, ACIP oversaw changes to the U.S. immunization schedule and deliberations followed a structured and transparent process—including through Work Groups' review of pertinent literature, public notice, and public comment. Compl. ¶ 120.

At the December 2025 ACIP meeting, ACIP recommended that CDC eliminate the three-decade old recommendation for the universal birth dose of the hepatitis B vaccine, and that vaccination instead generally be contingent on whether the mother tests positive for the virus. Compl. ¶ 85. ACIP also recommended that prior to obtaining subsequent doses of the hepatitis B

Case No. 3:26-cv-01609-VC                                    Pltfs.' Opp. to Mot. to Dismiss

vaccine for their children, parents consult with their health care providers to determine "if post-vaccination anti-HBs serology testing should be offered to assess a child's titer levels." *Id.* ¶ 87.

Unlike other recommendations throughout ACIP's history, "no scientific study has ever assessed this approach, let alone supported its efficacy." Compl. ¶¶ 88, 90 (the Kennedy-appointed ACIP "disregarded the weight of all available scientific data showing" prior recommendation was "highly safe and effective"). Notably, ACIP's chair stated during a break at the December 5 meeting that the committee felt "a little bit like puppets on a string as opposed to really being [an] independent advisory panel." *Id.* ¶ 83.

**D.  Secretary Kennedy bypasses ACIP entirely to implement the Kennedy Schedule.**

On December 5, 2025, President Trump issued a memorandum directing "the Secretary of [HHS] and the Director of the [CDC] to review best practices from peer, developed countries for core childhood vaccination recommendations," and to "update the United States core childhood vaccine schedule to align with" the schedules in other countries if their "best practices are superior." *Aligning United States Core Childhood Vaccine Recommendations with Best Practices from Peer, Developed Countries*, Presidential Memoranda (Dec. 5, 2025); Compl. ¶ 112.

Twenty-eight days later, Tracy Beth Høeg and Martin Kulldorff—two individuals known for outlier vaccine views—produced a report in "response to the President's directive" that negatively compared the U.S. childhood vaccination schedule to the schedules in other countries ("H-K Report"). Compl. ¶ 116; H-K Rep. at 8-25. Three days after that, on January 5, 2026, Dr. Mehmet Oz (the Administrator for the Centers for Medicare and Medicaid Services), Dr. Jayanta Bhattacharya (then of NIH), and Dr. Martin Makary (FDA)—sent then-acting CDC director Jim O'Neill a "Decision Memo" derived from the H-K Report that recommended approval of "a revised childhood and adolescent immunization schedule." *Id.* ¶ 99. O'Neill, who has no scientific background, signed the Decision Memo the same day without any recommendation by ACIP. *Id.*

4

The Decision Memo removes seven vaccines—those protecting against rotavirus, meningococcal disease, hepatitis A, hepatitis B, influenza, COVID-19, and respiratory syncytial virus ("RSV") (collectively the "Demoted Vaccines")—from the list of universally recommended vaccines and fragments the recommendations into three partially overlapping tiers (recommended for all, high risk, and shared clinical decisionmaking ("SCDM")). Compl. ¶¶ 100-03; ¶ 123 (created confusion around RSV recommendation). The CDC took this "unilateral and unprecedented action" without undertaking any of the scientific, evidence-based analysis that has formed the basis of all past decisions. *Id.* ¶ 121; ¶ 120 ("[b]y law, any recommendation should have originated with a properly constituted ACIP … consider[ing] input from CDC scientists, outside experts, and the public"); ¶ 119 (vaccine experts cut out of process).

## II. Procedural background.

Plaintiffs, a coalition of fourteen states and the Governor of Pennsylvania, filed this lawsuit on February 24, 2026. ECF No. 1. Plaintiffs allege five claims under the Administrative Procedure Act ("APA") and ask the Court to enjoin, vacate, and set aside the Kennedy Schedule, ACIP's reconstitution, and the hepatitis B recommendations. Compl. ¶¶ 330-95. Defendants filed their Motion on June 25, 2026. ECF No. 77.

### Argument

A State has standing to challenge a federal official or agency's conduct if the State has suffered "a concrete and imminent harm to a legally protected interest … that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). Defendants' attack on state standing is facial, rather than factual.[1] *See generally,*

---

[1] This response briefly summarizes injury allegations in the Complaint, which itself includes only a small fraction of the information that Plaintiffs have compiled in declarations from state health agencies and reports prepared by leading public health experts. If the Court has any question about

Case No. 3:26-cv-01609-VC                                    Pltfs.' Opp. to Mot. to Dismiss

Mot.; *see also Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Thus, the Court "must confine its inquiry to the allegations in the complaint," "assume[] that the allegations are true[,] and draw[] all reasonable inferences in the [Plaintiffs'] favor." *Nat. Res. Def. Council v. McCarthy*, 231 F. Supp. 3d 491, 496 (N.D. Cal. 2017).

## I.       Plaintiffs allege concrete, cognizable injuries.

This case—like many other cases where courts have found state standing—"concerns traditional monetary and operational injuries to the states and their instrumentalities." *New York v. Kennedy*, 155 F.4th 67, 73 (1st Cir. 2025); *City & Cnty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020) (alleged "financial injury," including Medicaid harm and "an overall increase in healthcare costs" established standing); *Massachusetts v. US Dep't of Health & Hum. Servs.*, 923 F.3d 209, 223 (1st Cir. 2019) (states had standing to challenge private health insurance exemption where injuries rested on "rational economic assumptions") (cleaned up).

Historically, the vaccines "placed on the routine immunization schedule were essentially the CDC's recommended default decision" because "the scientific evidence clearly showed that they were safe, effective, and important to public health." Compl. ¶ 239. In demoting vaccines from routine status to SCDM, the Kennedy Schedule explicitly communicates that children should get fewer vaccinations. 1/5/26 Decision Memo (immunizations deemed "non-consensus … are not routinely recommended for all children"). Defendants have also "complicat[ed] the administration of routine vaccinations … by spreading and reinforcing inaccurate information about the safety and efficacy of the Demoted Vaccines." Compl. ¶ 277; ¶ 110 (communicates that vaccines "are not safe enough"); ¶ 241 ("instruction to 'discuss with your clinician'" is "a barrier to getting

the Complaint's factual sufficiency, Plaintiffs request that the Court grant leave to amend so that Plaintiffs can further detail their injuries based on the declarations and reports they have gathered.

6

vaccinated" for over 100 million Americans without usual primary care access).

"Even slight decreases in vaccine uptake can have significant consequences on disease incidence." Compl. ¶ 292. For example, "[e]stimates show that delaying the initial hepatitis B vaccine dose by only two months for infants whose mothers are not known to be infected with hepatitis B could result in at least 1,400 new childhood hepatitis B infections annually nationwide." *Id.* ¶ 296. And over time, "a conservative estimate" is that "those infections would result in nearly 300 new cases of liver cancer and 480 hepatitis B-related deaths, generating over $222 million in healthcare costs." *Id.* The Kennedy Schedule will therefore cause "more vaccine-preventable disease cases and outbreaks," which "imposes direct costs on Plaintiff States' health and Medicaid agencies." Compl. ¶¶ 278, 283; *see also, e.g.,* ¶ 292 ("foreseeable increase in acute care needs"); ¶ 295 ("universal hepatitis B birth dose is the most cost-effective hepatitis B vaccination strategy; "[d]ecreases or delays in … administration … will substantially increase costs for … health systems and Medicaid programs").

The harms to Plaintiffs here are closely analogous to those in *New York*, which concerned Secretary Kennedy's impairment of CDC's infectious disease tracking through a reduction in force. The court there found that "CDC was no longer performing" critical infectious disease and other testing that states relied on, which "undermin[ed] [states'] ability to track infectious diseases … while also imposing financial harm due to their attempts to use their own resources to fill some of the gap." *New York*, 155 F.4th at 73. And "[t]o the extent that the plaintiffs' injuries [were] informational … plaintiffs alleged clear downstream consequences from failing to receive the information." *Id.* at 74.

Here, in lieu of degrading the CDC via staff cuts as in *New York*, Defendants directly abdicated their statutory public health role by rendering ACIP unreliable, eliminating the

longstanding universal birth dose and three-dose series of hepatitis B vaccine without any scientific basis, and then bypassing ACIP entirely to weaken the entire childhood immunization schedule. This will foreseeably cause a decrease in vaccination rates, which will lead to "more vaccine-preventable disease cases and outbreaks," financially burdening state Medicaid and health agencies. *E.g.*, Compl. ¶¶ 278-80, 283. State providers will also "spend more time counseling patients about vaccines … without any commensurate public health benefit." *Id.* ¶ 279; ¶ 282 (similar). These injuries are "certainly impending" and "there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 588 U.S. 752, 767-68 (2019) (states had standing where reinstatement of citizenship question on census would cause lower response rate by noncitizens, and undercount of noncitizens "by as little as 2%" would cause federal funding loss); *Biden*, 600 U.S. at 490-91 (states had standing to challenge federal student loan discharge based on injury to state instrumentality that performed "essential public function" by servicing loans) (cleaned up).

Changing decades-old vaccine recommendations without following proper statutory and regulatory procedure also wreaks havoc on the administration of Plaintiff States' public health laws. Because CDC's and ACIP's recommendations had for decades been "science-based, objective, and consistent," states have relied extensively on those "recommendations to guide and implement state vaccine policies, and to promote public health." Compl. ¶¶ 246-47. The recommendations have typically been "incorporated into state scope of practice laws, school entry requirements, and insurance coverage requirements, among other places." *Id.* ¶ 248. Until June 2025 (when Defendants began undermining ACIP), "nearly 600 statutes and regulations across forty-nine states, territories, and Washington, D.C. incorporated ACIP recommendations by reference." *Id.* States, for example, commonly regulate pharmacists' administration of vaccines by reference to ACIP's recommendations. *Id.* ¶¶ 255, 272. Minnesota law "prohibits insurers from

requiring prior authorization for immunizations recommended by the ACIP." *Id.* ¶ 273. And many states track the administration of vaccines recommended based on ACIP's or CDC's recommendations. *Id.* ¶¶ 256-57.

When federal action causes "additional expenses [to be] incurred" by states for "the development of a new system," that is a "concrete and imminent injur[y]-in-fact." *Washington v. Trump*, 145 F.4th 1013, 1023 (9th Cir. 2025), *cert. denied* (birthright citizenship order would have caused states "to create new systems to determine citizenship"). After having "rel[ied] extensively on CDC and ACIP's evidence-based recommendations to guide and implement state vaccine policies," Compl. ¶ 246, Plaintiffs must now reevaluate and redesign public health systems, laws, and regulations on an emergency basis. *See, e.g., id.* ¶¶ 258-59 ($150,000 to update immunization information systems; emergency legislative session to change laws); *id.* ¶ 301 ("thousands of staff hours" on emergency meetings and related work); ¶ 254 ("unscientific policy changes now impose substantial pressure on these States to change" their laws). Along with the monetary injury this entails, "being pressured to change state law constitutes" a sovereign injury. *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) ("forced choice between incurring costs and changing [state law] is itself an injury").

Plaintiff States are also now expending massive resources "to counter the impact of increased vaccine hesitancy and the erosion of public trust in vaccines caused by Defendants." Compl. ¶¶ 298-99. This includes extensive "staff time and resources creating and promulgating communications to the public and to healthcare providers regarding the continued safety and efficacy of" vaccines, as well as "resources reviewing and modifying their guidelines, webpages, and other relevant documents to address differences between state immunization requirements and the federal recommendations." *Id.* ¶ 299; *see also, e.g.,* ¶ 300 (new "notices and public health

9

orders to clarify state rules and ensure timely access to routine immunizations"); ¶¶ 302-19 (similar).

Plaintiffs are not spending money on public education and mitigation measures to "gather information and advocate," as in *FDA v. All. of Hippocratic Med.*, 602 U.S. 367, 394 (2024). Rather, they are doing it to remediate the "confusion and uncertainty" Defendants injected into the public health system and thereby mitigate the spread of vaccine-preventable disease. Compl. ¶ 253; ¶ 316 ("outbreak prevention, including surveillance and monitoring through testing and contact tracing … requires increased staff [and] improved data collection procedures"). And much of Plaintiffs' resource expenditure has been compelled by provider and public outreach *to* them due to Defendants' actions, not by Plaintiffs' own affirmative public health measures. *Id.* ¶ 306 ("questions from clinicians about whether and how they are supposed to document SCDM for vaccine visits"); ¶ 318 (similar).

## II.   Defendants' various attacks on standing are unavailing.

*Injury is not speculative*. The injuries that Plaintiffs allege are the logical and foreseeable consequence of Defendants' actions, with a direct causal chain between the actions and the injuries: Weakening vaccine recommendations—and "complicating the administration of routine vaccinations," while "spreading and reinforcing inaccurate information about the safety and efficacy" of vaccines—"will naturally and predictably reduce vaccination rates." Compl. ¶¶ 240, 277. Reducing vaccination rates is Defendants' avowed intent, and—consistent with common sense—academic research demonstrates that vaccination rates fall when recommendations are weakened. *Id.* ¶ 240; *see also, e.g.,* ¶ 154 (routinely recommended adolescent vaccine has 90% first-dose uptake and 60% booster-dose uptake; under SCDM, a similar vaccine has 32% first-dose uptake and 14% booster-dose uptake); ¶ 238 ("It is well-established in psychology, economics, and public health that making a behavior into a default increases its frequency."); ¶ 110

10

("[s]uggesting that certain vaccines are not safe enough to be routinely recommended … undermines trust and diminishes [vaccine] uptake").

Decreased vaccination rates in turn predictably result in increased vaccine-preventable disease cases and outbreaks. *See, e.g.,* Compl. ¶ 296 (detailing medical and financial costs of delayed hepatitis B immunization); ¶ 140-42 (introduction of rotavirus vaccine led to dramatic declines in physician visits, emergency room visits, and hospitalizations); ¶ 163 (incidence of hepatitis A "reached a historic low" following routine recommendation). And as discussed previously, increased disease "imposes direct costs on Plaintiff States' health and Medicaid agencies," while compelling states to expend more time and resources on mitigation efforts. *See, e.g.,* Compl. ¶¶ 278, 298.

Contrary to Defendants' characterization (at 11), *Washington v. FDA* expressly recognizes that a state, "[l]ike any party … has standing to challenge federal action that directly harms the state's economic interests or interferes with its operations as a service provider." 108 F.4th 1163, 1174 (9th Cir. 2024). And the alleged "injury need not be direct" if there is "a strong 'causal chain' that 'links' the federal action to the alleged harm." *Id.* at 1175; *see also California v. Azar*, 911 F.3d 558, 572 (9th Cir. 2018) ("no requirement that the economic harm be of a certain magnitude").

In *Washington,* the intervening states failed to establish standing because elimination of an "in-person dispensing requirement" for the drug mifepristone and the alleged increased Medicaid expense was too attenuated. *Id.* (elimination of in-person requirement would cause increased use by women with contraindications; which would cause complications; which would require follow-up care; which would cause increased Medicaid expense).[2] Likewise, *Hippocratic Medicine*

---

[2] *United States v. Texas* is even further afield. There, the plaintiff states asserted standing based on the theory that they "would incur additional costs because the Federal Government is not arresting

Case No. 3:26-cv-01609-VC                                    Pltfs.' Opp. to Mot. to Dismiss

involved an organizational challenge to the mifepristone rule, and the Supreme Court held that the plaintiffs lacked standing because the rule did not "directly affect[] and interfere[] with" their "core business activities." 602 U.S. at 395.

Here, by contrast to *Hippocratic Medicine*, protecting public health is among Plaintiff States' most important core business activities. *See, e.g.,* A.R.S. § 36-132(A) (statutory duty to "[p]rotect the health of the people of the state"); Cal. Health & Safety Code § 131056(d) ("protect and preserve the public health"). And by contrast to *Washington*, Plaintiffs' standing allegations are based on both the direct disruption of their public health systems and "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768; *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 121 (2025) (only "a predictable chain of events" required) (cleaned up).

***ACIP's reconstitution caused injury***. Defendants separately attack the ACIP reconstitution injury, asserting (at 7) that reconstitution "cause[d] no cognizable injury." This ignores that Defendants disbanded one of the nation's preeminent collections of public health experts and replaced it with unqualified vaccine skeptics hand selected by Secretary Kennedy, without notice or the requisite vetting. This directly undermined the basis for Plaintiffs' historical reliance on ACIP—its expertise—and "inject[ed] immediate confusion and uncertainty into the administration of many of Plaintiff States' public health laws and regulations." Compl. ¶ 253.

---

more noncitizens." 599 U.S. 670, 676 (2023). That claim "r[an] up against the Executive's Article II authority to enforce federal" criminal law, and there was no "precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies." *Id.* at 676-78; *see also New York,* 155 F.4th at 73 (*Texas* "inapposite" outside law enforcement context). Further, *Texas* also recognized that—even in the context of federal law enforcement—plaintiffs might state a claim "if an agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." 599 U.S. at 682-83 (cleaned up). Plaintiffs need not make this showing here, but this *is* an extreme case.

Case No. 3:26-cv-01609-VC                              Pltfs.' Opp. to Mot. to Dismiss

Defendants' assertion (at 8) that ACIP's Membership Balance Plan has no legal significance is wrong. *See Am. Acad. of Pediatrics v. Kennedy*, 823 F. Supp. 3d 141, 169 n.63 (D. Mass. 2026) ("*AAP*") ("lack of adherence to these prescribed procedures, designed to ensure compliance with FACA, provides strong evidence that the newly constituted ACIP likely violates FACA"). But Defendants' various unlawful actions are also closely interrelated. *Cf.* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). Defendants could not have weakened the hepatitis B recommendation with a lawfully constituted ACIP comprised of properly vetted experts. *See* Compl. ¶ 173 ("[t]he safety and efficacy of the hepatitis B vaccine in its standard three-dose series … has been rigorously studied and continuously monitored since licensure"; "long-term follow-up studies consistently demonstrate that the hepatitis B vaccine is safe regardless of vaccine timing, [and] no safety benefits were identified for a delayed first dose versus vaccination at birth").

Defendants are also eager to comply with a new political directive ordering ACIP to reimplement the January 2026 childhood immunization schedule that the court enjoined in *AAP*— establishing with certainty that an unlawfully constituted ACIP poses an ongoing, imminent threat to public health. *See Realigning United States Core Childhood Vaccine Recommendations with Best Practices from Peer, Developed Countries*, Executive Order (May 29, 2026) (calling the H-K Report "a guiding resource for the Federal Government" and ordering ACIP to "take any appropriate steps to update the United States childhood and adolescent vaccine schedule"); 6/12/26 Motion to Expedite Appeal, No. 26-1503, at 1, 5 (asking First Circuit to expedite appeal because "a recent Executive Order … *demand[s]* ACIP action" and "*directs* the CDC and ACIP to update the childhood and adolescent schedule") (emphases added).

Case No. 3:26-cv-01609-VC                                      Pltfs.' Opp. to Mot. to Dismiss

Thus, whether the ACIP reconstitution is viewed in isolation or as part of a foreseeable causal chain, it is a proximate cause of the injuries that Plaintiffs allege. Defendants' arguments to the contrary—(e.g., at 8) that "ACIP independently voted on vaccine recommendations"—do not negate the appointments' harm, and are disputed facts that are impermissible on a facial challenge. *See* Compl. ¶ 83 ("puppets on a string").[3]

**Injuries are not self-inflicted.** Defendants also misconstrue what it means for injuries to be "self-inflicted" under *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976). There, certain states imposed state taxes on income earned by nonresidents. *Id.* at 662-63. Other states responded by offering tax credits to residents who were subject to the out-of-state taxes. *Id.* at 664. And then the latter states alleged injury based on the offsetting tax credits that they had chosen to issue. *Id.* Thus, their injuries "were self-inflicted" because the defendants' action had not caused any injury itself, and the decision to issue tax credits was purely discretionary. *Id.* But in general, if governmental action causes a pocketbook injury, it is incorrect to say that the injury is self-inflicted because the plaintiff voluntarily chose to go into that line of business.

Here, Defendants' action itself caused direct and immediate injury to Plaintiffs' administration of their public health systems and will cause increased costs to state Medicaid systems. When states' school entry, insurance coverage, and vaccine tracking systems are tethered to ACIP's recommendations—and then CDC bypasses ACIP and replaces clear recommendations (recommended/not recommended) with equivocal SCDM recommendations—states are compelled to update their systems and take other action to mitigate the confusion that follows. And

---

[3] Contrary to Defendants' further contention (at 8-9), vacating the ACIP reconstitution would redress harm by ensuring that ACIP is not populated with unqualified individuals who are subject to improper influence. Regardless, "the causation and redressability requirements are relaxed once a plaintiff has established a procedural injury." *Azar*, 911 F.3d at 573 (cleaned up).

when more kids enrolled in state Medicaid programs predictably contract rotavirus, states will bear the financial cost. Because states *must* protect public health, they cannot simply choose not to track infectious diseases or to cease administering their Medicaid programs. *See Washington*, 145 F.4th at 1023-24 (rejecting a similar "self-inflicted" injury argument and noting that a state has standing "even though its financial injury stemmed from its choice to" provide a given service).

Defendants' related assertion (at 9) that "[n]othing required [states] to rely on federal recommendations" is equally unfounded. Again, Defendants have a statutory obligation to assist states "in the prevention and suppression of communicable diseases," 42 U.S.C. § 243(a), and Plaintiff States have spent decades designing legal and public health infrastructure in reliance on the CDC's and ACIP's evidence-based recommendations. Under the APA, federal agencies have a heightened duty to justify their actions when longstanding policy "has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But the CDC pulled the rug out without public input or even notice, compelling Plaintiff States to review and update their public health systems and recommendations to continue to accomplish their core public functions and prevent more severe financial injury.

APA considerations aside, Defendants pitch a conception of causation that makes no legal or logical sense. If a public bridge collapses, it is not a defense that trapped drivers could have just stayed at home. Likewise, CDC cannot invite state reliance for decades in accordance with its statutory responsibilities, and then wash its hands of injurious, unlawful action. *See Oregon v. Kennedy*, No. 6:25-CV-02409-MTK, 2026 WL 1048354, at *1 (D. Or. Apr. 18, 2026) ("wanton disregard for the rule of law causes very real harm to very real people").

## Conclusion

The Court should deny the Motion.

15

Case No. 3:26-cv-01609-VC                                    Pltfs.' Opp. to Mot. to Dismiss

July 16, 2026                                   Respectfully submitted,

**KRISTIN K. MAYES**                            **ROB BONTA**
Attorney General for the State of Arizona       Attorney General for the State of California

*/s/ Joshua D. Bendor*                          */s/ Katherine Milton (with permission)*
Joshua D. Bendor*                               Katherine Milton
*Solicitor General*                             Deputy Attorney General
Clinten N. Garrett*                             Neli Palma
Syreeta A. Tyrell*                              Senior Assistant Attorney General
Alexa G. Salas*                                 Kathleen Boergers
*Assistant Attorneys General*                   Nimrod P. Elias
Office of the Arizona Attorney General          Supervising Deputy Attorneys General
2005 N. Central Ave.                            Marnie G. Ganotis
Phoenix, Arizona 85004                          Deputy Attorney General
Joshua.Bendor@azag.gov                          455 Golden Gate Avenue
Clinten.Garrett@azag.gov                        San Francisco, CA 94102-7004
Syreeta.Tyrell@azag.gov                         (415) 229-0118
Alexa.Salas@azag.gov                            katherine.milton@doj.ca.gov
                                                Neli.Palma@doj.ca.gov
*Attorneys for the State of Arizona*            Kathleen.Boergers@doj.ca.gov
                                                Nimrod.Elias@doj.ca.gov
                                                Marnie.Ganotis@doj.ca.gov

                                                  *Counsel for the State of California*

**Additional Plaintiffs' Counsel**

**PHILIP J. WEISER**                            **WILLIAM TONG**
 Attorney General for the State of Colorado     Attorney General of Connecticut

*/s/ David Moskowitz (with permission)*         */s/ Shawn L. Rutchick (with permission)*
David Moskowitz*                                Shawn L. Rutchick*
Deputy Solicitor General                        Assistant Attorney General
Nora Passamaneck*                               165 Capitol Ave
Senior Assistant Attorney General              Hartford, CT 06106
Colorado Department of Law                      (860) 808-5210
1300 Broadway, #10                              Shawn.Rutchick@ct.gov
Denver, CO 80203
(720) 508-6000                                  *Attorneys for Plaintiff State of Connecticut*
david.moskowitz@coag.gov

16

*Attorneys for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

/s/ *Vanessa L. Kassab (with permission)*
Ian R. Liston*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**AARON M. FREY**
Maine Attorney General

/s/ *Kendall R. Schutzer (with permission)*
Kendall R. Schutzer*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8452
Fax: 207-287-3145
Kendall.Schutzer@Maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ *Michael Drezner (with permission)*
Michael Drezner*
 Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6959
mdrezner@oag.state.gov

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

/s/ *Neil Giovanatti (with permission)*
Neil Giovanatti*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorney for the State of Michigan*

**KEITH ELLISON**
Attorney General for the State of Minnesota

/s/ *Jennifer Moreau (with permission)*
Jennifer Moreau*
Brian S. Carter**
Assistant Attorneys General

**JENNIFER DAVENPORT**
Attorney General of New Jersey

/s/ *Joshua P. Bohn (with permission)*
Joshua P. Bohn*
Kevin Bui*
Amanda McElfresh*

17

445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 757-1195
jennifer.moreau@ag.state.mn.us
brian.carter@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*


**RAÚL TORREZ**
New Mexico Attorney General

*/s/ Justin McCarthy (with permission)*
Justin McCarthy*
Assistant Solicitor General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 629-7741
jmccarthy@nmjoj.gov

*Attorney for State of New Mexico*


**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Kathryn T. Gradowski (with permission)*
Kathryn T. Gradowski*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2810
kgradowski@riag.ri.gov
Rhode Island Bar No. 10871

*Counsel for the State of Rhode Island*


*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 696-5366
Joshua.Bohn@law.njoag.gov
Kevin.Bui@law.njoag.gov
Amanda.McElfresh@law.njoag.gov

*Counsel for the State of New Jersey*


**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy (with permission)*
Scott P. Kennedy*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*


**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Amanda Quester (with permission)*
Amanda Quester*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-8690
amanda.quester@wisdoj.gov

*Counsel for the State of Wisconsin*

18

**JOSH SHAPIRO**
*in his official capacity as Governor of the*
*Commonwealth of Pennsylvania*

Jennifer Selber
*General Counsel*

<u>*/s/ Aimee D. Thomson (with permission)*</u>
Aimee D. Thomson*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov

*Counsel for Governor Josh Shapiro*

  *Admitted Pro Hac Vice*
  ** *Pro Hac Vice application forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the CM/ECF system, will be sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing.


July 16, 2026                                */s/ Joshua D. Bendor*


20